1
2
3
4
5
6
7
8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANDREW RAMIREZ,

11              Plaintiff,                    No. 2:11-cv-0045 LKK KJN P

12        vs.

13   D. SWINGLE, et al.,                      ORDER AND

14              Defendants.                   FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action

18   pursuant to 42 U.S.C. § 1983.  This action is proceeding on the original complaint filed

19   January 5, 2011, as to defendants Physician's Assistant Medina and Chief Medical Officer

20   ("CMO") Swingle.  (Dkt. No. 1.)  Plaintiff alleges that he received inadequate medical care.

21              Pending before the court are defendants' July 20, 2012 motion for summary

22   judgment (Dkt. No. 53), and plaintiff's motions for injunctive relief filed October 28, 2011, and

23   January 20, 2012 (Dkt. Nos. 28 and 35).

24              On February 24, 2012, defendants filed an opposition to plaintiff's motions for

25   injunctive relief.  (Dkt. No. 38.)  On June 22, 2012, defendants were ordered to file further

26   ////

                                                1

1  briefing in support of their opposition.  (Dkt. No. 50.)  Defendants' summary judgment motion

2  contains a supplemental opposition to plaintiff's motions for injunctive relief.

3          On July 26, 2012, the undersigned provided plaintiff with notice of the

4  requirements for opposing a summary judgment motion pursuant to Woods v. Carey, 684 F.3d

5  934 (9th Cir. 2012).  On September 26, 2012, plaintiff filed a motion for an extension of time to

6  file his opposition to defendants' summary judgment motion and supplemental opposition.  (Dkt.

7  No. 62.)  On September 28, 2012, plaintiff filed a timely opposition.  (Dkt. No. 64.)  On

8  October 16, 2012, defendants filed a reply.  (Dkt. No. 65.)

9          Because plaintiff's opposition is timely, his motion for extension of time to file an

10  opposition is denied as unnecessary.

11          After carefully reviewing the record, the undersigned recommends that

12  defendants' summary judgment motion be granted and plaintiff's motions for injunctive relief be

13  denied.

14  II.  Motion for Summary Judgment

15          Defendants argue that they are entitled to summary judgment on the merits of

16  plaintiff's claims and also based on qualified immunity.

17      A.  Legal Standard for Summary Judgment

18          Summary judgment is appropriate when a moving party establishes that the

19  standard set forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should

20  be rendered  if . . . there is no genuine issue as to any material fact, and that the movant  is

21  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

22          Under summary judgment practice, the moving party always bears
           the initial responsibility of informing the district court of the basis
23          for its motion, and identifying those portions of "the pleadings,
           depositions, answers to interrogatories, and admissions on file,
24          together with the affidavits, if any," which it believes demonstrate
           the absence of a genuine issue of material fact.

25

26  ////

2

1  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

2  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be

3  made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions

4  on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery

5  and upon motion, against a party who fails to make a showing sufficient to establish the

6  existence of an element essential to that party's case, and on which that party will bear the

7  burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential

8  element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

9  In such a circumstance, summary judgment should be granted, "so long as whatever is before the

10  district court demonstrates that the standard for entry of summary judgment, as set forth in Rule

11  56(c), is satisfied."  Id.

12         If the moving party meets its initial responsibility, the burden then shifts to the

13  opposing party to establish that a genuine issue as to any material fact actually exists.  See

14  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

15  establish the existence of such a factual dispute, the opposing party may not rely upon the

16  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

17  form of affidavits, and/or admissible discovery material, in support of its contention that the

18  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

19  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

20  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

21  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

22  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

23  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

24  1436 (9th Cir. 1987).

25         In the endeavor to establish the existence of a factual dispute, the opposing party

26  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

1 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

2 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary

3 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

4 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

5 committee's note on 1963 amendments).

6        In resolving a summary judgment motion, the court examines the pleadings,

7 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

8 any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

9 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

10 court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

11 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

12 produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

13 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

14 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

15 show that there is some metaphysical doubt as to the material facts . . . Where the record taken

16 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

17 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

18       B. Legal Standard for Eighth Amendment Claim

19        Generally, deliberate indifference to a serious medical need presents a cognizable

20 claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

21 punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). According to Farmer v. Brennan,

22 511 U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the

23 prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and

24 disregards that risk by failing to take reasonable measures to abate it." The deliberate

25 indifference standard "is less stringent in cases involving a prisoner's medical needs than in

26 other cases involving harm to incarcerated individuals because 'the State's responsibility to

4

1   provide inmates with medical care ordinarily does not conflict with competing administrative

2   concerns.'" McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v.

3   McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v.

4   Miller, 104 F.3d 1133 (9th Cir. 1997).  Specifically, a determination of "deliberate indifference"

5   involves two elements:  (1) the seriousness of the prisoner's medical needs; and (2) the nature of

6   the defendant's responses to those needs.  McGuckin, 974 F.2d at 1059.

7            First, a "serious" medical need exists if the failure to treat a prisoner's condition

8   could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.

9   (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need

10   for medical attention include the existence of an injury that a reasonable doctor or patient would

11   find important and worthy of comment or treatment; the presence of a medical condition that

12   significantly affects an individual's daily activities; or the existence of chronic and substantial

13   pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

14   (9th Cir. 1990)).

15            Second, the nature of a defendant's responses must be such that the defendant

16   purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

17   "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

18   indifference may occur when prison officials deny, delay, or intentionally interfere with medical

19   treatment, or may be shown by the way in which prison physicians provide medical care."

20   Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

21   indifference to be established, there must first be a purposeful act or failure to act on the part of

22   the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

23   purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

24   deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

25   defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

26   further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

1    Mere differences of opinion concerning the appropriate treatment cannot be the

2 basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

3 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not

4 fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.

5 Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a

6 serious medical condition, even if some treatment is prescribed, may constitute deliberate

7 indifference in a particular case.  Id.

8    In order to defeat defendants' motion for summary judgment, plaintiff must

9 "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv.,

10 809 F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

11 excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511

12 U.S. at 837).

13    C.  Qualified Immunity

14    "'Qualified immunity shields federal and state officials from money damages

15 unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional

16 right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"

17 Hunt v. County of Orange, 2012 WL 432297 at *7 (9th Cir. Feb. 13, 2012) (quoting Ashcroft v.

18 al-Kidd, 131 S. Ct. 2074, 2080 (2011)).  "A Government official's conduct violates clearly

19 established law when, at the time of the challenged conduct, 'the contours of a right are

20 sufficiently clear' that every 'reasonable official would have understood that what he is doing

21 violates that right.'"  Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal alterations

22 omitted).

23    Although the court was once required to answer these questions in order, the

24 United States Supreme Court has clarified that "while the sequence set forth there is often

25 appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 555 U.S. 223,

26 236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

1  statutory or constitutional violation, "there is no necessity for further inquiries concerning

2  qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).  Likewise, if a court determines

3  that the right at issue was not clearly established at the time of the defendant's alleged

4  misconduct, the court may end further inquiries concerning qualified immunity without

5  determining whether the allegations in fact make out a statutory or constitutional violation.

6  Pearson, 555 U.S. at 236–42.

7          In resolving the question of qualified immunity, the court views the facts in the

8  light most favorable to the plaintiff.  See Schwenk v. Hartford, 204 F.3d 1187, 1198 (9th Cir.

9  2009).

10         D.  Plaintiff's Claims

11         Plaintiff alleges that in October 2009, he filed an administrative grievance

12  alleging that defendant Medina did not provide him with adequate medical care.  In the

13  grievance, plaintiff alleged that defendant Medina mismanaged plaintiff's diabetes and pain

14  medicines and failed to provide him with physical therapy.  In the grievance, plaintiff also

15  alleged that he required physical therapy because he was confined to a wheelchair.  Plaintiff

16  alleges that in November 2009, defendant Swingle interviewed him regarding this grievance.

17  Plaintiff alleges that defendant Swingle agreed with defendant Medina's alleged mismanagement

18  of his medical care.

19         Plaintiff alleges that on December 2, 2009, defendant Medina interviewed

20  plaintiff.  Plaintiff alleges that defendant Medina was very upset about the grievance plaintiff

21  had filed against him.  Plaintiff alleges that in retaliation, defendant Medina lowered plaintiff's

22  pain medication dosage and began making unnecessary changes to plaintiff's insulin dosage.

23         In the pending motions for injunctive relief, plaintiff requests that defendants be

24  ordered to provide him with adequate pain medication, adequate doses of insulin, breathing

25  treatments and a walker.  Regarding pain medication, plaintiff specifically requests that he be

26  provided with morphine or tramadol and gabapentin.

7

E.  Defendants' Evidence

        In support of the pending motion for summary judgment and supplemental

opposition to plaintiff's motions for injunctive relief, defendants rely on the lengthy declaration

of defendant Swingle.  (Dkt. No. 53-3.)  After reviewing this declaration, and supporting

exhibits, the undersigned finds it necessary to set forth most of the lengthy declaration in order to

put defendants' motion and supplemental opposition in context.  Accordingly, the undersigned

sets forth the relevant portions of defendant Swingle's lengthy declaration herein:

**Background**

6.  On October 2008, Ramirez was housed at Calipatria State
Prison (Calipatria).  (Attach. 1, [Unit Health Record] UHR 1-4.)
He had a history of multiple co-morbid medical problems,
including 1) Type 2 diabetes mellitus, 2) chronic pain with
questionable radicular symptoms secondary to an old pelvic
fracture and leg-length discrepancy, and 3) an incisional ventral
hernia that had occurred after a 2006 surgery to repair a perforated
colon caused by diverticulitis – an infection in pockets
(diverticulae) formed in the walls of the colon.  Ventral hernias are
not uncommon following surgery of the kind Ramirez had.  (Id.)
The hernia was surgically repaired with mesh in 2007, but recurred
in 2008, with associated abdominal pain.  (Id.)  Ramirez was also
followed for chronic obstructive pulmonary disease (COPD),
coronary artery disease (CAD), hypertension (HTN), renal
insufficiency, coccidiodomycosis (Valley Fever), loss of hearing,
hepatitis C, obstructive sleep apnea (OSA), and morbid obesity
because he was 5'3" tall and weighed over 200 pounds.  (Id.)

7.  Ramirez was prescribed a number of medications for his
various medical problems, including metformin and glipizide for
diabetes; tramadol, 50 mg., one tablet, t.i.d. (three times a day)
(150 mg./daily) for nociceptive pain; and gabapentin (Neurontin),
300 mg., two tablets every morning, one tablet at noon, and two
tablets in the evening (1,500 mg./daily) for neuropathic pain.
(Attach. 1, UHR 1-2.)  There are two types of nociceptive pain:
somatic pain and visceral pain.  Somatic pain comes from the
joints, bones, muscles and other soft tissues, while visceral pain
comes from the internal organs.  Neuropathic pain is chronic pain
that results from damage to or dysfunction of the peripheral or
central nervous system.  Treatment of pain is difficult and often
complex, and is even more so in a correctional institution where
many prisoners have histories of substance abuse, including
prescription medications, and drug dealing.  It is a constant
struggle to provide appropriate pain relief while ensuring that a
prisoner is not feigning or exaggerating pain symptoms to acquire

opiate-type medications for his own use or to supply other inmates. Narcotic-type medications have significant value as recreational drugs for sale in correctional institutions.  That trade is also a source of violence in prison as a result of disputes or dealers preying on prisoners who have access to medications because of a genuine illness.  And narcotic-type medications and drugs like tramadol can have significant side effects, and can be lethal in overdose or when given to patients with co-morbid conditions.

8.  A doctor at Calipatria found that Ramirez was at high risk for significant abdominal pain from a recurrent incisional ventral hernia, and for the possibility of drug seeking behavior because of a history of intravenous heroin addiction.  (Attach. 1, UHR 4.)

9.  In late October 2008, Ramirez was transferred from Calipatria to Alvarado Hospital for surgical evaluation for a recurrent ventral hernia at the edge of Marlex mesh that had been placed during the 2006 surgery for a perforated colon.  (Attach. 1, UHR 5-12.)  The surgeon found that Ramirez complained of severe abdominal pain that was not related to the recurrent hernia at the edge of the mesh.  (Id.)  The surgeon concluded that Ramirez had a small, reducible hernia close to the area of the previous repair that could be caused by "bunching" of the Marlex mesh used in the repair.  (Id.)  The surgeon found that further surgery might relieve Ramirez's chronic pain, but probably would not.  (Id.)  Ramirez decided not go to ahead with surgery because the benefits did not outweigh the risks.  (Id.)  Instead, the surgeon recommended pain management.  (Id.)  The surgeon increased Ramirez's gabapentin to 600 mg., three times a day (1,800 mg./daily) and continued the tramadol without change.  (Id. at 12-13.)  The surgeon noted that he would consider taking Ramirez off tramadol and placing him on methadone, 10 mg. two or three times a day, but that these pain medications would need adjustment to keep Ramirez from going back to the emergency room for medications.  (Id.)

10.  On November 5, 2008, a doctor at Calipatria noted that Ramirez was on the maximum dose of pain medication usually given, that he had failed on Tylenol # 3, and that, without further evaluation, he could not get morphine and Dilaudid, which he claimed had provided him with pain relief in the past.  (Attach. 1, UHR 14-17.)  The doctor noted that Ramirez's old pelvic fracture and leg discrepancy was another issue for his chronic pain complaint, but was not evaluated that day, and that Ramirez used a cane to walk.  (Id.)  The doctor continued tramadol without change, but increased the gabapentin to 300 mg., three tablets in the morning, one tablet at noon, and three tablets in the evening (2,100 mg./daily).  (Id. at UHR 17.)

11. On December 1, 2008, Ramirez was seen at Pioneer Hospital for a complaint of abdominal and chest pain.  (Attach. 1, UHR 18-30.)  He was diagnosed with an incisional hernia and told that it

might cause a dull ache that could be treated with medication, and that it might occasionally cause severe pain if the intestine poked through and became twisted or trapped (incarcerated).  (Id. at UHR 28.)  Ramirez was told to limit heavy lifting, straining, or pushing and told that he might wear an abdominal binder or truss, similar to a brace that fit around the belly.  (Id.)  He was told to seek emergency care if he had a change in pain, the hernia protruded and would not go back in, or he had nausea or vomiting.  (Id.)  Ramirez was discharged on tramadol, 100 mg., three times a day (300 mg./daily) and gabapentin, 600 mg. in the morning, 300 mg. at noon, and 600 mg. in the evening (1,500 mg./daily).  (Id. at UHR 30.)

12.  On December 13, 2008, Ramirez was admitted again to Pioneer Hospital for worsening pain over the previous two days.  (Attach. 1, UHR 31-36.)  After examination, a doctor found no emergency condition.  (Id. at UHR 32.)  Ramirez was given intravenous (IV) Dilaudid for pain and discharged in stable condition to Calipatria the same day.  (Id. at UHR 35-36.)

13.  On December 22, 2008, a doctor at Calipatria saw Ramirez for follow-up on his many medical problems.  (Attach. 1, UHR 37-40.)  The doctor noted that Ramirez was having problems with chronic pain, which he attributed to the ventral hernia and pelvic fracture/leg discrepancy, and that he was on tramadol and gabapentin and did not want to try Tylenol # 3 (acetaminophen with codeine) in place of the tramadol.  (Id.)  The doctor noted that Ramirez's hernia was not tender at that time, that he should ask to be seen if he had increased pain, and that a recommendation for a medical transfer to another institution was pending approval.  (Id.)  Ramirez asked to try a wedge pillow to see if it would help relieve pain.  (Id.)  The doctor ordered gabapentin , 900 mg., one tablet, three times a day (2,700 mg/daily) for neuropathic pain for 90 days.  (Id.)  There was no evidence of neuropathic pain from the old hip fracture/leg discrepancy problem that would warrant this kind of pain medication, but gabapentin had been promoted for off-label use in treating pain without studies showing that it was effective in treating pain other than the two kinds for which it was approved.  The doctor wrote a Comprehensive Accommodation Chrono (CDCR 7410) for ground floor/bottom bunk housing, a cane, insoles for Ramirez's shoes, and an abdominal binder.  (Id. at UHR 41.)  A wedge pillow would not provide relief for pain associated with the ventral hernia or the old pelvic fracture/leg discrepancy.

14.  On January 22, 2009, a doctor saw Ramirez for follow-up and found that he had a large hernia that was not incarcerated and had intermittent pain.  (Attach. 1, UHR 42-44.)  Ramirez asked to try Tylenol # 3 for "breakthrough pain," which is sharp pain that comes on suddenly and is not alleviated by regular pain medications.  (Id. at UHR 42.)  The doctor ordered Tylenol # 3,

two tablets, once in the morning and once in the evening, as needed, for abdominal pain, for 90 days.  (Id. at UHR 44.)

15.  On February 2, 2009, a neurologist saw Ramirez for complaints of low back pain, pain related to his ventral hernia, and difficulty walking.  (Attach. 1, UHR 45-46.)  The neurologist noted that Ramirez continued to complain of pain and went to the Treatment and Triage Area (TTA) – the prison's emergency room – for toradol injections, even though he was taking 2,700 mg. of gabapentin a day, tramadol and Tylenol # 3.  (Id.)  The neurologist noted that Ramirez should lose weight.  (Id. at UHR 46.)  The neurologist advised Ramirez to wear his abdominal binder and recommended a magnetic resonance imaging test (MRI) for his low back pain complaint.  (Id.)  The neurologist noted that Elavil could be added to the other pain medications if that did not pose a cardiac problem.  (Id.)  The doctor noted that Ramirez was awaiting transfer to a facility in northern California because he was on medications that made him sensitive to, and at increased risk, from high temperatures.  (Id.)

16.  On February 10, 2009, Ramirez again was admitted to Pioneer Hospital for a complaint of chest and abdominal pain.  (Attach. 1, UHR 48-58.)  A CT of Ramirez's abdomen showed that the hernia was not obstructed.  (Id. at UHR 54.)  He was given IV morphine sulfate and discharged back to Calipatria in stable condition.  (Id.)

17.  As of February 24, 2009, Ramirez was on gabapentin, 300 mg., three tablets, three times a day (2,700 mg. total) for neuropathic pain, and tramadol, 100 mg., one tablet, three times a day (300 mg./daily) for somatic/visceral pain.  (Attach. 1, UHR 59-62.)  He was also receiving blood glucose checks three times a day; Lantus insulin, 26 units every evening; sliding scale regular insulin in varying amounts depending on how much his finger stick blood glucose was above 200 mg/dL; and glipizide, five mg. ,one tablet, twice a day, for diabetes.  (Id.)  Lantus insulin (insulin glargine) is a long acting form of insulin used to treat Type 1 (insulin dependent) or Type 2 (non insulin dependent) diabetes. Glipizide is an oral medication that can be taken alone, or with insulin, to treat Type 2 diabetes.  Glipizide causes the pancreas to produce insulin and helps the body use insulin efficiently.

**Treatment at HDSP**

18.  Ramirez transferred to HDSP on March 4, 2009.  (Attach. 1, UHR 63-64.)

19.  On arrival at HDSP, Dr. Lankford wrote an order continuing Ramirez's diabetes treatment regimen and for tramadol and gabapentin, without changes.  (Attach. 1, UHR 65-66.)

////

11

20.  Tramadol is in a class of medications called opiate agonists that change the way the body senses pain. It is prescribed for moderate to moderately severe pain.  It is not a Schedule II medication and a physician's assistant or nurse practitioner can change the dose written by a doctor.  A Schedule II medication, however, requires a physician's co-signature for a physician's assistant to order, unless the physician's assistant has completed a special course of study.  Nevertheless, tramadol can be habit forming and can have significant side effects as breathing difficulty or seizures and may not be appropriate for patients with a history of drug addiction, asthma or those with obstructive sleep apnea, which Ramirez had.

21.  Tramadol was not in the CDCR formulary established by the Pharmacy and Therapeutics (P & T) Committee as part of the remedial plan in Plata v. Davis, U.S. Dist. Ct., N.D. Cal., No. C-01-1351 THE prisoner class action.  Its use on a non-formulary basis required the approval of the institutions's Chief Medical Officer.

22.  Gabapentin is not a Schedule II medication and a physician's assistant or nurse practitioner can change the dose written by a doctor.  Gabapentin is in the CDCR formulary, but is only approved by the U.S. Food and Drug Administration (FDA) at present for the treatment of complex seizures in patients with epilepsy and post-herpetic neuralgia (PHN) (nerve pain caused by shingles).  Although its manufacturer promoted its off-label use for the treatment of other nerve pain, such as diabetic neuropathy, the manufacturer was fined for doing so in the absence of evidence-based studies showing that the drug was effective in treating those types of pain.  Ramirez did not have either of the kinds of nerve pain for which gabapentin was approved.

23.  Both tramadol and gabapentin are potential drugs of abuse among patients with histories of drug abuse and in correctional institutions.  For that reason, tramadol and gabapentin are given crushed in liquid and under direct observation therapy (DOT) to minimize the potential for hoarding them or giving them to other inmates.

24.  On March 18, 2009, Nurse Practitioner Wrigley saw Ramirez and changed the gabapentin order for Dr. Lankford from 900 mg., three times a day, (2,700 mg. total) to 1,800 mg., twice a day (3,600 mg.).  (Attach. 1, UHR 68-74.)  That is the maximum daily amount of that medication.  Wrigley continued tramadol, 100 mg., three times a day for low back pain on a non-formulary basis.  (Id.)  Wrigley also ordered metformin, 1,000 mg., twice a day for diabetes.  (Id., at UHR 72.)  The same day, Nurse Practitioner Wrigley wrote a Comprehensive Accommodation Chrono for, among other things, ground floor/bottom bunk housing, a cane, shoe insoles, an abdominal binder, and use of a wheelchair because

Ramirez complained that he could not walk to the medical clinic for his diabetic medications because of chronic pain.  (Id. at UHR 71.)  Physician's assistants and nurse practitioners are primary care providers (PCPs) in CDCR institutions.  They are expected to manage their patient population and care for individual patients based on CDCR treatment guidelines and protocols.  The standard practice for pain management is that dosing should be adjusted to the lowest possible level to achieve function.  Narcotic-type medications are used to treat nociceptive pain which cannot be controlled by non-narcotic medications and for which an objective cause can be found.  Function is defined as the ability to perform activities of daily living (ADLs), such as grooming, dressing, housekeeping, walking to a dining hall or medical appointments, and mild daily exercise, such as walking around the track on the yard.

25.  On March 24, 2009, Ramirez complained of pain from his hernia.  (Attach. 1, UHR 75-76.)  He was taken to the TTA and given Tylenol, 975 mg, one tablet, and referred for follow-up by a doctor.  (Id.)

26.  The next day, March 25, 2009, Nurse Practitioner Wrigley saw Ramirez, who asked that he be given morphine or Tylenol # 3 for pain, in addition to tramadol and gabapentin he had been prescribed.  (Attach. 1, UHR 77.)  Ramirez's request for additional and different opiate-type medications only a week after his gabapentin dose was increased, and before the effectiveness of the increase could be assessed, is a flag for possible drug-seeking behavior.

27.  On April 2, 2009, Nurse Practitioner Wrigley changed Ramirez's blood glucose checks to twice a day, rather than three times a day.  (Attach. 1, UHR 79.)  A hemoglobin A1C test done on April 3, 2009, was 6% which indicates well-controlled diabetes.  (Id. at UHR 80.)  The A1C test gives an indication of blood glucose control over the preceding two or three months.  It is not subject to the variations present in finger stick blood glucose checks and, for that reason, gives a more accurate measure of the control of blood glucose in diabetics.  Although goals are individualized for each patient, the general goal is an A1C below 7%.

28.  On April 9, 2009, Nurse Practitioner Wrigley changed Ramirez's tramadol to 50 mg., three tablets, twice a day (300 mg/daily), rather than 100 mg. three times a day.  (Attach. 1, UHR 81.)

29.  On April 29, 2009, Nurse Practitioner Wrigley saw Ramirez who reported continued pain from his ventral hernia.  (Attach. 1, UHR 83-84.)  Wrigley noted that a surgical evaluation had been requested and added acetaminophen, 325 mg., two tablets, three

times a day, as needed for pain.[1]  (Id.)  The addition of non-opioid medications, like acetaminophen, can increase the efficacy of opioid-type of medications, like tramadol, without the need to increase the dose of the opioid medication.  But less than a week later, on May 6, 2009, Ramirez asked that his tramadol and gabapentin be given three times a day, rather than twice a day.  (Id. at UHR 85.)  That request was also a flag for possible drug-seeking behavior.

30.  On May 21, 2009, Ramirez was hospitalized at Banner Lassen Medical Center (BLMC) for chest pain.  (Attach. 1, UHR 86.)  Ramirez returned to HDSP on May 24, 2009.  (Id.)

31.  On June 1, 2009, Ramirez was seen by Physician's Assistant Miranda and said that a full cardiac work-up had been negative, that he had had an asthma attack because he had been taking fewer puffs a day of his Amanex inhaler than had been ordered, and that he felt well.  (Attach. 1, UHR 86-88.)  Ramirez requested and was referred to a podiatrist for evaluation of his need for orthotics to lift his left heel, and to an ophthalmologist for an annual diabetes vision exam.  (Id.)  Miranda noted that Ramirez also had a ventral hernia and that a surgical consultation was pending.  (Id.)  Miranda found that Ramirez's diabetes was well-controlled, but Ramirez asked to see a doctor, claiming that sliding scale regular insulin should be given when he had a finger stick blood glucose above 150 mg/dl, rather than above 200 mg/dl, as the doctor had ordered.  (Id.)  Miranda continued Ramirez's medications without change and referred him to the Podiatry Clinic.  (Id. UHR 88-89.)  Miranda noted that Ramirez exhibited drug seeking behavior, even though his current doses of gabapentin and tramadol appeared to be adequate.  (Id. at UHR 87.)

32.  On June 24, 2009, Dr. Harvey saw Ramirez in the Podiatry Clinic for an annual diabetic foot examination.  (Defs.' Ex. A, Swingle Decl., Attach. 1, UHR 89-90.)  Ramirez asked for "special diabetic shoes," claiming that he had neuropathic pain in his feet when walking because of diabetes and his old pelvic fracture/leg discrepancy.  (Id.)  Dr. Harvey noted that Ramirez had tennis shoes that he wore to the exercise yard, as well as orthopedic boots that he wore to school, even though he sat during class.  (Id.)  Dr. Harvey found that, in the past, Ramirez had only been given an insole that lifted his left heel an insignificant amount, that there were no acute changes in his condition, and that Ramirez refused to walk to demonstrate his problem when asked to do so during the examination.  (Id.)  Dr. Harvey found that Ramirez did minimal walking without his orthopedic boots and did not demonstrate

---

[1]  The undersigned cannot locate the notation in Nurse Practitioner Wrigley's records from April 29, 2009, indicating the addition of acetaminophen to plaintiff's pain regimen.

diabetic neuropathic pain that would qualify him for special diabetic shoes.  (Id.)

33.  On July 14, 2009, an ophthalmologist found that Ramirez did not have diabetic retinopathy.  (Attach. 1, UHR 91-93.)

34.  On August 3, 2009, Ramirez complained of a spike in pain from his ventral hernia but nursing staff noted that he presented a contradictory picture because he would grimace in pain for medical staff, but would stop, laugh, and show no signs of symptoms when talking with custody staff.  (Attach. 1, UHR 94.)

35.  On August 7, 2009, Ramirez had a hemoglobin A1C that was 5.6%, indicating that his diabetes was well-controlled.  (Attach. 1, UHR 94.)

36.  On August 10, 2009, an officer and a nurse observed Ramirez get out of his wheelchair and walk without difficulty or assistance. (Attach. 1, UHR 96.)  Ramirez had been allowed to use the wheelchair to get to and from the medical clinic because he claimed he was unable to walk due to pain.  (Id.)  When asked why he was not using the wheelchair, Ramirez kicked the medical clinic grill gate and balanced on one foot with a cane while hitting the gate, without apparent signs of distress.  (Id.)  Nurse Practitioner Burgett issued a new Comprehensive Accommodation Chrono that discontinued ground floor housing and use of a wheelchair due to his evidenced lack of need for these items.  (Id. at UHR 99.)

37.  Ramirez was moved from Facility C to administrative segregation in Facility D.

38.  On August 23, 2009, Physician's Assistant Medina saw Ramirez about a disability accommodation request and a related inmate appeal (CDCR 602), dated August 6, 2009, in Log No. HDSP C-09-1597, asking for orthopedic shoes because he had pain when walking due to an old pelvic fracture/leg discrepancy. (Attach. 1, UHR 103-104; Attach. 2 IA 3-12.)  Ramirez came to the interview wearing orthopedic boots, but said he had been told he needed "different" ones.  (Id.)  Medina noted that Ramirez had walked into the clinic with a cane, exhibiting some difficulty walking and moving, but that an officer had seen him straddling a commode and bottom bunk and scrubbing the bunk without any apparent problem or complaint.  (Id.)  Medina partially granted his appeal and issued an updated accommodation chrono for ground floor cell/bottom bunk housing, a cane, shoe inserts, and orthopedic boots, but Medina did not approve use of a wheelchair because he did not believe Ramirez needed one.  (Id.)  Ramirez was allowed to use a cane, was on high doses of pain medications, and his behavior had not been consistent with the need for a wheelchair to ambulate.  (Id.)

39.  On September 3, 2009, Ramirez asked for insoles for his shoes, which were delivered to him.  (Attach. 1, UHR 105.)

40.  On September 5, 2009, Physician's Assistant Miranda saw Ramirez in the TTA for a complaint of unresolved severe chest pain.  (Attach. 1, UHR 106.)  I was notified, and Ramirez was given nitroglycerin and flown to a community hospital for treatment.  (Id.)

41.  Physician's Assistant Medina saw Ramirez on September 8, 2009, for chronic care follow-up.  (Attach. 1, UHR 107.)  Several days before, Ramirez had gone to the TTA for complaint of chest pain.  (Id.)  He was sent to a community hospital for evaluation and treatment and returned to HDSP without any ongoing problem.  (Id.)  Medina also interviewed him in response to an inmate appeal in Log No. HDP-31-09-12626, submitted July 14, 2009, complaining that he needed to see an orthopedist for orthopedic boots and shoe inserts, and that Nurse Practitioner Burgett had discontinued his prescription for glipizide and metformin that he took for diabetes.  (Id. at Attach. 2, IA 13-21.)  Medina had provided an accommodation chrono on August 23 that was approved by Dr. Nepomuceno on September 3, 2005, allowing Ramirez to have the orthopedic shoes, and insoles had been given to him.  (Id. at Attach. 1 UHR 104-105.)  Ramirez's diabetes medications had not been discontinued, and Ramirez had been seen by the podiatrist, Dr. Harvey, on June 24, 2009, at which time Ramirez said he wore tennis shoes to the exercise yard and his orthopedic boots to school, even though he sat while at school.  (Id. at Attach. 2, IA, 18.)  Dr. Harvey stated that although Ramirez was at high risk for foot problems due to his diabetes, he was using the orthopedic boots only minimally for walking.  (Id.)  Medina noted that Dr. Harvey had not ordered any other special shoes for walking at that time because they were not medically necessary.  (Id.)

42.  On September 17, 2009, a psychiatric technician saw Ramirez standing and bending over his bed without using his cane or holding onto the furniture while making his bed.  (Attach. 1, UHR [108].)  When Ramirez saw the psychiatric technician, he immediately sat on the bed and smiled, stating that he was "okay."  (Id.)

43.  On September 21, 2009, Physician's Assistant Medina saw Ramirez for two more CDCR 602s and a related accommodation request.  (Attach. 1, UHR 109-110; Attach. 2, IA 22-43.)  Ramirez had submitted an inmate appeal in Log No. HDP-31-09-13046, on July 23, 2009, complaining that he had not been given multivitamins for hepatitis C and Valley Fever.  (Id. Attach. 2, IA 22-29.)  Following Medina's interview with Ramirez, that appeal was denied by Dr. Nepomuceno because there was no medical indication that he needed multivitamins for those medical

conditions, and that his Comprehensive Metabolic Panel (CMP) tests had been normal. (Id. at Attach. 2, IA 27.) Ramirez had also submitted an accommodation request and related appeal in Log No. HDSP-C-09-1610, dated August 12, 2009, asking for a number of items, including a wheelchair to help him "get around" because he claimed that he had a problem walking due to pain from his ventral hernia. (Id. at 1A 30-43.) That appeal had been denied at the first level because the accommodations he requested had been discontinued by Nurse Practitioner Burgett on August 10, 2012 as not medically indicated. (Id. at 1A 38-39.) The appeal was denied at the second level by Dr. Nepomuceno the day after Medina talked with Ramirez, with a notation that Dr. Swingle had reviewed Mr. Ramirez's UHR and concurred with Nurse Practitioner Burgett's assessment. (Id. at 1A 40-41.) Medina noted that Ramirez had previously been seen standing in his cell, cleaning and straddling the lower bunk and commode, and conversing through the ventilation system with another inmate, but exhibiting none of the difficulty in mobility that he did when ambulating to the medical clinic. (Id. at Attach. 1, UHR 109.) Ramirez filed a third level appeal in HDSP Log No. 31-09-13360 on the same issues that was also denied. (Id. at Attach. 2, 1A 44-49.) On examination, Medina noted no numbness, tingling or weaknesses in his extremities, no neurologic deficits, nor other indications that would explain the gait he affected when walking. (Id. at Attach. 1,UHR 109.) At the September 21, 2009 health care encounter, Medina referred Ramirez to the High Risk Clinic because he had been refusing diabetic care. (Id.)

44. On September 30, 2009, I approved an updated Comprehensive Accommodation Chrono for ground floor/bottom bunk housing, a CPAP with humidifier, a single point wood cane, orthopedic shoes, hearing aids, an abdominal binder, a vest identifying Ramirez as mobility and hearing-impaired, use of waist chains in the institution, and sedentary work only. (Attach. 1, UHR 112.) Dr. Swingle did not approve a wheelchair at that time. (Id.)

45. On October 14, 2009, Physician's Assistant Medina saw Ramirez for an inmate appeal in Log No. HDSP-D-1973, submitted on September 13, 2009, in which he was asked for a walking cane, hearing aids, a humidifier for his CPAP machine and abdominal binder. (Attach. 1, UHR 113; Attach. 2, IA, 50-58.) Those items had been approved in the September 30, 2009 accommodation chrono, but Ramirez complained that he had not received them yet. (Id. at Attach. 1, UHR 112.) Ramirez had a cane and hearing aids, and Medina told him that a soft abdominal binder to replace the one he had, and a humidifier had been ordered and would be delivered when they arrived. (Id. Attach, 2, IA 56.) Ramirez, however, appealed to the second level where he was told the soft abdominal binder had arrived, but the humidifier had not. (Id. at Attach. 2, IA 57-58.)

46.  On October 29, 2009, Ramirez told a nurse to tell me [defendant Swingle] that he was "not going to play her games" and returned his inhalers and keep-on-person (KOP) medication, including the glipizide and metformin he was taking for diabetes. (Attach. 1, UHR 114.)  Two days later, Ramirez asked to have the KOP medications returned because he was "not feeling well." (Id. at UHR 115.)  The medications were returned, except for the inhalers, because they were empty, so refills were ordered.  (Id.)

47.  On November 1, 2009, Ramirez asked to see a doctor, claiming he had not slept, was in pain, and needed additional pain medication.  (Attach. 1, UHR 116.)

48.  On November 2, 2009, I saw Ramirez, who had been referred to the High Risk Clinic for consultation by Physician's Assistant Medina in response to one of his inmate appeals and because of his continued refusal to follow his diabetic care regimen.  (Attach. 1,UHR 117-122.)  Ramirez claimed that he did not go to the pill line for his diabetic medications or to the clinic for evaluation, primarily because he reported significant pain when walking due to increased abdominal pain from his hernia and an "artificial" hip. (Id.)  Ramirez asked for a wheelchair, when necessary, to get to the pill line and clinic.  (Id.)  I agreed to provide a wheelchair if Ramirez agreed to completely comply with his diabetic management, and Ramirez agreed.  (Id.)  I noted that Ramirez's hernia had been repaired two times; that he had a bowel perforation, diverticulitis, and diverticulosis; and that he would be referred for evaluation as to whether further surgical repair was indicated, given the tenderness he was reporting and disability in his activities of daily living.  (Id.)  I noted that it was possible he would not have a successful repair and that, if that was the case, he would continue to have discomfort.  (Id.)  I approved an updated Comprehensive Accommodation Chrono providing for use of a wheelchair.  (Id.)  I also requested that Ramirez be seen for a surgical evaluation and by an audiologist, ordered various tests and ordered a follow-up in a month.  (Id.)

49.  On November 11, 2009, Physician's Assistant Miranda saw Ramirez in the TTA for a complaint of left-sided chest pain that had resolved with one tablet of nitroglycerin, but had returned, had become more intense, and did not decrease with two nitroglycerin tablets and use of an inhaler.  (Attach. 1, UHR 123-127.)  Miranda conferred with me and then referred Ramirez to BLMC for further testing and evaluation.  (Id.)  Ramirez was discharged from the hospital the next day after laboratory tests showed no significant changes, and he was found to be stable.  (Id.)

50.  On November 14, 2009, during the morning medication pass, officers saw a nurse give Ramirez his tramadol and gabapentin. But after the nurse left, the officers saw Ramirez's cellmate stick his fingers in the medication cup and lick the remnants from his

fingers.  (Attach. 1, UHR 129.)  During the evening medication pass, Ramirez took his tramadol and gabapentin from medical staff, which were given floated in a cup of water, but he sat on a toilet, holding the medications, but not taking them.  (Id. at UHR 128.)  Ramirez said they "tasted bad."  (Id.)  When asked to take the medications, Ramirez refused and became argumentative, stating that staff did not need to wait and observe him taking the medications.  (Id.)  After several minutes, Ramirez began to sip the medication while the nurse waited at the door until he drank all of them.  (Id.)  Later that day, Ramirez was advised of the importance of medication compliance, and that his medication was ordered for him and not his cellmate.  (Id.)  Ramirez was told that failure to properly take his medications could lead to a discontinuance of the medications.  (Id.)

51.  The next day, November 15, 2009, during Ramirez's morning medical care, Ramirez told medical staff that a psychiatric technician had not shown him "respect" and that his "other friends" would find out, and "it would be on you guys."  (Attach. 1, UHR 130.)  That statement could have been a threat to staff or could be concerning because it may mean that Ramirez was at risk as a result of what had happened the day before if he were no longer able to share his opioid medications with his cellmate.

52.  On November 23, 2009, a nurse reviewed a health care services request with an attached note written by Ramirez in which he claimed that I had approved his request for additional pain medication and for a wedge pillow, egg crate mattress and humidifier; and that he had been told to give the CDCR 7362 to nursing staff to get those items.  (Attach. 1, UHR 131.)  The nurse told Ramirez to get a copy of the form showing the approval, but Ramirez could not because only the humidifier had been approved.  (Id.)

53.  On November 24, 2009, Physician's Assistant Medina interviewed Ramirez for a first-level response to his inmate appeal in Log No. HDSP-D-09-2179, submitted November 10, 2009, in which he asked for an accommodation chrono for a wedge pillow, nebulizer, knee brace, cotton blanket, and arch supports.  (Attach. 2, IA 59-66.)  Ramirez also asked to see a dietician about his diet and a doctor about pain management, dialysis and a urology consultation.  (Id.)  Ramirez also asked to have handrails installed in his cell and to be allowed use of a wheelchair in his cell, rather than only to get to the medical clinic.  (Id.)  Medina explained to Ramirez that he did not have a medical condition for which a wedge pillow or knee brace was required, that he had a CPAP and humidifier, that he had orthopedic shoes and did not require arch supports, that he would be given a cotton blanket if a test showed he was allergic to wool, and that he would not be seen by doctors for pain management, dialysis, and urology consultations, or by a dietician, because he had no current medical indication for those

19

specialty services.  (Id.)  Medina also denied his request for use of a wheelchair in his cell because he was able to get around his cell without one, and he had a wheelchair for use outside his cell.  (Id.)  Dr. Nepomuceno denied the request for me at the second level.  (Id. at IA 65-66.)

54.  On December 3, 2009, Ramirez asked to see me because his gabapentin and tramadol orders would expire in one week.  (Attach, 1, UHR 133.)  Ramirez wanted the same dose of those medications, but asked that the frequency be increased to three times a day, rather than twice a day.  (Id.)  He was referred by nursing staff to Physician's Assistant Medina who made no changes in his diabetes and pain treatment medications.  (Id.)

55.  Later that day, Ramirez submitted an appeal in Log No. HDP-31-09-1462 complaining that Physician's Assistant Medina had retaliated against him for filing inmate appeals by telling him that he had "nothing coming from [Medina]," and that if he needed any kind of medical treatment or service, he "should go cry to Dr. Swingle."  (Attach. 2, IA 67-79.)  The appeal was handled as a staff complaint, investigated by Dr. Nepomuceno, and denied by him and Health Care Manager Avquaviva on February 4, 2010, because Ramirez's claims were found to be unsubstantiated.  (Id.)

56.  On December 7, 2009, Dr. Syverson saw Ramirez to evaluate him for possible further surgery to repair the ventral hernia.  (Attach. 1, UHR 136-138.)  Dr. Syverson noted that Ramirez had a 10 by 15 centimeter ventral abdominal hernia in the upper abdomen around a healed midline scar and a five centimeter abdominal hernia to the right of the scar just below the umbilicus.  (Id.)  Dr. Syverson found that surgery would require removal of the old mesh used to repair the hernia in the past and replacement with two new pieces of mesh, that this would have to be done at a tertiary-care hospital because of Ramirez's multiple co-morbidities and the extraordinarily high risk of complications from surgery, and that the risk of recurrence of the two ventral abdominal hernias following surgery was very high.  (Id.)  Dr. Syverson recommended that Ramirez be referred to a tertiary-care hospital for operative management and preoperative care if a decision was made to attempt further surgical repair.  (Id.)

57.  On December 9, 2009, Physician's Assistant Medina re-ordered tramadol and gabapentin for Ramirez.  (Attach. 1, UHR 144.)  Medina ordered gabapentin 1,200 mg. twice a day (instead of 1,800 mg.), and tramadol 100 mg. twice a day, instead of 150 mg.  (Id.)  Medina had Ramirez sign a pain management and controlled substance agreement.  (Id. UHR 145.)  That was appropriate because of the mid-November 2009 behavior indicating that Ramirez may have been sharing his opioid medications with his cellmate.

58.  On December 11, 2009, Ramirez asked Physician's Assistant Medina for three tablets of his tramadol and gabapentin, rather than the dose he had ordered.  (Attach. 1, UHR 166.)  Medina told nursing staff to continue the medications as written.  (Id.)

59.  The next day, December 12, 2009, Ramirez began to refuse his insulin and all diabetic care because of the change in his tramadol and gabapentin dosing.  (Attach. 1, UHR 154-162.)  Ramirez, however, did not stop taking his tramadol and gabapentin.  (Id. UHR 147-153.)  The same day, Ramirez also was brought to the TTA, complaining of abdominal pain from his hernia.  (Id. at UHR 171-172.)  Ramirez yelled at the nurse trying to evaluate him, and threatened to call an attorney and me.  (Id.)  Ramirez insisted that surgery to repair his hernia had to be done at a tertiary care hospital.  (Id.)  The nurse noted pain contract violations for sharing medications with a cellmate.  (Id.)  Ramirez claimed that he was not getting tramadol, and that Medina had "taken his medications away," which was not true.  (Id.)  Ramirez was referred for follow-up with a primary care provider, but later that day he said he would refuse his medications, including diabetic medications, and not eat because he was being denied treatment.  (Id. at UHR 172.)

60.  On December 13, 2009, Ramirez asked to be given three tablets of tramadol and gabapentin, three times a day, instead of three tablets, twice a day.  (Attach. 1, UHR 17[3].)  Over the next week, Ramirez said he would be on a hunger strike and not take his insulin and diabetic medications unless he got the pain medication doses he wanted.  (Id. at UHR 174, 178.)  Ramirez continued to take the lower doses of tramadol and gabapentin I had ordered, but not his insulin and diabetic medications.  (Id. at UHR 147-163.)

61.  On December 21, 2009, Physician's Assistant Medina saw Ramirez because he had not been following his diabetic treatment regimen.  (Attach. 1, UHR 180-181.)  Ramirez said he was unhappy that his ADA and 602 appeals had been denied and that he wanted to see me in the High Risk Clinic.  (Id.)  Medina told Ramirez that he needed to adhere to his diabetic regimen and that he could suffer harmful effects, up to and including death, if he did not.  (Id.)  At that time, Ramirez was still prescribed Lantus insulin, sliding-scale regular insulin, glipizide and metformin for his diabetes.  (Id.)

62.  On January 11, 2012, Ramirez said he needed an egg-crate mattress and wedge pillow to use with his CPAP machine.  (Attach. 1, UHR 187.)  Medical staff noted that those items were not ordered in the most recent accommodation chrono.  (Id.)

63.  On January 25, 2012, Ramirez again asked for an egg crate mattress, a wedge pillow, and an increase in the frequency of his tramadol from two to three times a day.  (Attach. 1, UHR 188.)

64.  On February [4], 2010, Physician's Assistant Medina saw Ramirez for his regularly scheduled chronic care appointment. (Attach. 1, UHR 189.)  Ramirez had been refusing to come to the clinic and reported that he was having increased abdominal pain because of his hernia.  (Id.)  Ramirez agreed to comply with his medical treatment orders.  (Id.)  Medina continued his insulin and oral diabetes medications, without changes.  (Id. at UHR 196-197.)  Medina decided to increase his doses of those medications [i.e., gabapentin and tramadol] to what they had been before his December 9, 2009 order.  (Id.)  Medina ordered gabapentin, 1,800 mg. twice a day, and tramadol, 150 mg., twice a day.  (Id.)

65.  On March 2, 2012, Dr. Gonzalez noted that Ramirez had multiple abdominal wall hernias and would be scheduled for laparoscopy and possible open repair of his abdominal wall for a recurrent incisional hernia.  (Attach. 1, UHR 191.)  Surgery was done at Shasta Regional Medical Center on March 4, 2010.  (Id. at UHR 199.)

66.  After Ramirez's return to HDSP, he was sent to Renown Regional Medical Center on May 7, 2010, when he reported increased abdominal pain and had an increase in his pancreatic enzymes.  (Attach. 1, UHR 198-199.)  A doctor there found that further surgery was not indicated and treated him for pancreatitis.  (Id. at UHR 200.)

67.  Ramirez was returned to HDSP on May 10, 2010, and admitted to the Correctional Treatment Center (CTC), where he was followed by Dr. Lee, and discharged back to Facility D on May 24, 2010.  (Attach. 1, UHR 247-256.)

68.  On May 28, 2010, Dr. Hoffman saw Ramirez for follow-up and noted that he was on antibiotics for infected mesh used in the repair of his recurrent ventral hernia and that morphine sulfate, controlled release (MS Contin), 15 mg., twice a day, for 30 days had been ordered for pain.  (Attach. 1, UHR 257.)  Morphine sulfate is a narcotic analgesic used to treat moderate to severe pain lasting all day and for more than a few days.  Because it is a narcotic, it is habit-forming and should not be used long-term for patients with a history of drug addiction, like Ramirez.  And because it can cause slow, shallow, irregular breathing, it must be used with caution and not long-term with patients, like Ramirez, who have obstructive sleep apnea.

69.  On June 9, 2010, Dr. Hoffman saw Ramirez for follow-up on multiple problems and increased his morphine to 15 mg., three times a day, for 30 days for pain.  (Attach. 1, UHR 262-263.)  Dr. Hoffman also issued a new Comprehensive Accommodation Chrono.  (Id.)

////

70.  On June 28, 2010, Dr. Hoffman ordered morphine to 15 mg., twice a day, for 30 days.  (Attach. 1, UHR 266.)

71.  On July 21, 2010, Dr. Hoffman saw Ramirez for follow-up, noted that his ventral-hernia repair was slowly healing and that Ramirez complained of abdominal pain when he was sitting up or lying down.  (Attach. 1, UHR 269.)  Dr. Hoffman noted that Ramirez did not report pain when his dressings were changed, that custody and nursing staff had observed Ramirez moving fairly freely without pain, and that Ramirez had been known to pressure health care providers for morphine, so there was a question of secondary gain with his request for that medication.  (Id.)  Dr. Hoffman made no changes in his pain medications at that time.

72.  On July 29, 2010, Physician's Assistant Medina re-ordered morphine, 15 mg., twice a day, for another 30 days.  (Attach. 1, UHR 271.)

73.  On August 17, 2010, Ramirez's surgical wound was noted to be well-healed.  (Attach. 1, UHR 273.)  Ramirez was also seen by a cardiologist for recurrent chest pain with risk factors for coronary artery disease.  (Id. at UHR 274-276.)  The cardiologist, however, found that a stress test was normal, that his chest pain was atypical, and that the only way to rule out coronary artery disease (CAD) was a coronary angiogram.  (Id.)

74.  On August 17, 2012, Dr. Hoffman updated Ramirez's Comprehensive Accommodation Chrono.  (Attach. 1, UHR 277.) The chrono provided for ground floor/bottom cell housing, use of a wheelchair for six months, a walker for three months, a cane, orthopedic shoes, a CPAP machine with a humidifier, a nebulizer, an abdominal binder, a mobility and hearing-impaired vest, waist chains inside the prison, and job assignments that did not require walking.  (Id.)

75.  In late August 2010, Dr. Hoffman refilled orders for acetaminophen, 325 mg., two tablets, three times a day, as needed for pain, for one year to August 20, 2011, and morphine, 15 mg., twice a day for 30 days.  (Attach. 1, UHR 282-286.)

76.  On August 31, 2010, Ramirez asked that bars be installed around the toilet in his cell and that he be allowed to use a wheelchair in his cell and have a mirror installed at wheelchair height because of his chronic pain.  (Attach. 1, UHR 281.)

77. On September 24, 2010, Dr. Hoffman re-ordered morphine, 15 mg., one tablet in the morning, and 15 mg., one tablet, in the evening for 30 days.  (Attach. 1, UHR 293.)  The same day, Ramirez again refused diabetic treatment unless he got his "ADA needs" met with a new wheelchair, an "ADA mirror," a grab bar in his cell, and an anti-skid surface in front of the shower he used.

(Id. at UHR 295.)  Ramirez told a nurse that he had not eaten and would not come out for diabetes care, if he did not get what he wanted.  (Id. UHR 296.)

78.  On September 27, 2010, Ramirez had a coronary angiogram that showed very mild, minimal nonobstructive coronary disease with a preserved left ventricular function (the measurement of how much blood is being pumped out of the left ventricle of the heart – the main pumping chamber – with each contraction).  (Attach. 1, UHR 294.)  A left ventricular fraction between 55 and 70 is considered normal.  The cardiologist recommended that Ramirez hold off on taking metformin for diabetes for 48 hours until tested, and that he could resume the metformin if he had normal creatinine levels.  (Id.)

79.  On September 28, 2010, Dr. Hoffman ordered morphine 30 mg., one tablet, every morning and 15 mg., one tablet, every evening for pain, for 30 days.  Gabapentin 600 mg., two tablets, twice a day was also ordered.  (Attach 1, UHR 298-303.)

80.  On October 2, 2010, Ramirez had a normal resting electrocardiogram (EKG) – a test for electrical problems in the heart.  (Attach. 1, UHR 306.)

81.  On October 26, 2010, Ramirez refused a scheduled appointment with Dr. Hoffman to discuss his diabetes and a follow-up with Dr. Gonzales about whether further surgery should be done to repair his abdominal wall.  (Attach. 1,UHR 314.)  A hemoglobin A1C was 5.3%, [sample collected on October 25, 2010] which showed excellent control of Ramirez's diabetes.  (Id. at UHR 311.)

82.  On November 8, 2010, Ramirez asked that his tramadol, which was to expire later that month, be re-ordered.  (Attach. 1, UHR 315.)  Pharmacy records showed that his prescription for morphine, ordered by Dr. Hoffman, did not expire until March 28, 2011.  (Id. at UHR 316-317.)

83.  On November 17, 2010, Dr. Hoffman saw Ramirez because of his refusal to take insulin.  (Attach. 1, UHR 318-319.)  Dr. Hoffman noted that Ramirez sometimes did that when he was upset about other issues.  (Id.)  Ramirez said he had abdominal pain and wanted a second opinion on whether surgery would help. (Id.)  Dr. Hoffman noted that a referral to a tertiary-care center would be made for a second opinion, although the hernia might be too big to repair.  (Id.)

84.  On November 21, 2010, Ramirez again asked to be seen, claiming that his tramadol order was about to expire and needed to be re-ordered.  It was not set to expire and did not need to be re-ordered.  (Attach. 1, UHR 321.)

85.  On November 22, 2010, Ramirez came to his cell door to receive his medications and was found to have swelling, bruising, and scratches to his face, stomach, right knee, right bicep, under the left knee, neck and a red spot on top his head.  (Attach. 1, UHR 322-323.)  Ramirez claimed he had lost consciousness and had fallen.  Ramirez was sent to BLMC for evaluation and treatment.  (Id. at UHR 324-329.) [The undersigned observes that BLMC's list of current medications for plaintiff included gabapentin, 2400 mg. daily, tramadol 200 mg. daily and 15 mg morphine p.m., 30 mg morphine a.m. (Id. at 324.)  The list does not include acetaminophen, although other records indicate that plaintiff was receiving this drug at this time.]

86.  On November 30, 2010, Dr. Hoffman saw Ramirez for follow-up and noted that Ramirez's injuries were consistent with, and may have occurred, in an altercation with his cellmate.  (Attach. 1, UHR 330-335.)  Dr. Hoffman noted that a KUB (kidney, ureter, bladder) test had been done at BLMC to check the status of the ventral hernia.  (Id.)  A KUB is an abdominal imaging test to look at organs and structures in the belly area, including the spleen, stomach, and intestines.  (Id.)  The KUB did not show incarceration of the hernia.  (Id.)  Dr. Hoffman noted that Ramirez wanted to discontinue his morning blood glucose checks, claiming it was too painful for him to get out of bed.  (Id.)  Dr. Hoffman noted that his blood sugars were in extremely good control and that it was safe to try, if Ramirez agreed to come for evening blood sugar checks when his Lantus insulin was administered.  (Id.)  Dr. Hoffman also noted that he had put in a request for approval of continued use of non-formulary tramadol.  (Id.)  Continued use of non-formulary tramadol was not approved by the Chief Medical Officer [i.e., defendant Swingle] because Ramirez had been receiving it, as well as acetaminophen, 325 mg., and morphine for somatic/visceral pain, as well as gabapentin for nerve pain, without apparent mitigation of his pain.

87.  On December 3, 2010, Dr. Hoffman stopped morning sliding scale regular insulin because Ramirez's morning blood glucose checks had been stopped, the sliding-scale insulin was only given based on blood glucose checks that were above certain levels, and because Ramirez's hemoglobin A1C's showed that his diabetes was in excellent control.  (Attach. 1, UHR 336-337.)

88.  On December 8, 2010, Dr. Hoffman saw Ramirez for abdominal pain and noted that he had seen Dr. Gonzales for a second opinion about further surgery, but that Dr. Gonzales had left the decision to Ramirez.  (Attach. 1, UHR 341.)  Dr. Hoffman noted that his diabetes was doing well, even without morning blood glucose checks.  (Id.)  Dr. Hoffman made no changes in his diabetes medications (Lantus insulin and metformin).  (Id.)

////

89.  On December 21, 2010, an officer told Dr. Hoffman that Ramirez was asking for his left-shoe heel lift and asked whether he needed it.  (Attach. 1, UHR 344-345.)  Dr. Hoffman noted that Ramirez claimed he had gotten the lift because one leg was shorter than the other because of an old pelvis injury.  (Id.)  Dr. Hoffman questioned the medical necessity for the lift since Ramirez claimed that he was wheelchair-bound and could barely walk.  (Id.)  Dr. Hoffman said she would talk with Physician's Assistant Medina, who had discontinued the lift when Ramirez was given use of the wheelchair.  (Id.)

90.  On December 28, 2010, Dr. Hoffman ordered a wedge pillow for Ramirez's complaint of neck and back pain, shoe inserts, and a left shoe because of Ramirez's reported difficulty walking and balancing in his cell when not using a wheelchair.  (Attach. 1, UHR 350-351.)  These orders appear to have been to accommodate Ramirez, but I can find no evidence that the wedge pillow was medically indicated, or that the other accommodations would have relieved pain associated with his ventral hernia or old pelvic fracture/leg discrepancy.  Dr. Hoffman noted that Ramirez might benefit from physical therapy for his difficulty walking and balancing, but that problem, if true, would have been associated with Ramirez's insistence on using a wheelchair, rather than exercising his leg muscles by walking, as a result of his chronic pain complaints.  I found no record that Dr. Hoffman or any health care provider ordered physical therapy.  (Id.)  Dr. Hoffman noted that Ramirez's referral for an opinion on whether further surgery was possible for the ventral hernia, or whether conservative treatment was the only option, had been made by Dr. Syverson.  (Id.)  Dr. Hoffman noted that Ramirez had hepatitis C, without a detectable viral load.  (Id.)

91.  On January 4, 2011, Dr. Hoffman began tapering Ramirez off gabapentin because it was only approved by the FDA and CDCRA formulary for use as an adjuvant therapy for the treatment of certain seizures and post-herpetic neuralgia, neither of which Ramirez had.  Gabapentin remained in the CDCR formulary for those uses, but it was no longer to be stocked in the HDSP pharmacy and ordered for other types of pain, as it had in the past.  Moreover, Ramirez had been on a high dose of gabapentin for over a year without evidence that it was effective in relieving his pain.  Dr. Hoffman counseled Ramirez about being weaned off gabapentin and the reasons.  (Attach. 1, UHR 358-359.)  Ramirez stated that he wanted to try oxcarbazepine (Trileptal) instead of gabapentin, for treatment of neuropathic pain.  (Id.)  Dr. Hoffman noted that Ramirez was on many medications that could interact with oxcarbazepine, and this would have to be checked before starting him on that medication.  (Id.)  Oxcarbazepine carries major risks for patients being treated for renal insufficiency.  (Id. at UHR 355.)  Ramirez was tapered off gabapentin by mid-January 2011.  (Id. at UHR 362.)  A January 5, 2011 renal ultrasound

showed renal masses that were likely type 1 and 2 renal cysts.  (<u>Id.</u> at UHR 372.) [The undersigned notes that in January 2011, plaintiff was still taking morphine.  (<u>Id.</u> at 361)]

93.  On January 24, 2011, Ramirez was seen by Dr. Syverson for a recurrent abdominal hernia.  (Attach. 1, UHR 364.)  Dr. Syverson noted the multiple prior repairs, that the hernia was the same size it had been before the previous surgical repair and did not require further surgery at that time.  (<u>Id.</u>)  Dr. Syverson found that, if the hernia became larger, Ramirez could be referred to a tertiary-care medical center for evaluation, but he doubted that further surgical repair would be possible because it would have a high risk of complications, including death.  (<u>Id.</u>)  Dr. Syverson recommended that Ramirez's pain should be treated as needed.  (<u>Id.</u>)

94.  On January 28, 2011, an X-ray of Ramirez's lumbar spine for severe low back pain showed no acute bony abnormality and possibly some disc space narrowing at L4-5 and L5-S1, with normal facets, with no significant endplate degenerative changes, but evaluation of the disc spacing was limited by suboptimal projection.  (Attach. 1, UHR 365.)

95.  On February 2, 2011, Physician's Assistant Medina completed an updated Comprehensive Accommodation Chrono that approved ground floor/bottom bunk housing, grab bars around his toilet and a toilet riser seat, a CPAP machine with humidifier, a walker and wheelchair to assist with ambulation, arch insoles and a shoe lift, a hearing aid, a mobility and hearing-impaired vest, wedge pillow, and an abdominal binder.  (Attach. 1, UHR 368.)  The medical record shows that, the same day, Ramirez asked to see Dr. Pomazal because Medina had told him that he needed to see the doctor to have morphine sulfate re-ordered.  (<u>Id.</u> at UHR 373.)  The same day, Ramirez was found to be hoarding diabetic snack packages that were intended to be consumed the same day they were provided.  (<u>Id.</u>)  Medina had not stopped Ramirez's morphine, made any changes in his pain medications, or diabetic treatment since the last time he had seen Ramirez in July 2010.  (<u>Id.</u>)

96.  On February 18, 2011, Ramirez again asked to see Dr. Pomazal to ask that he re-order morphine for his ventral hernia and a complaint that he could not go to the clinic for his diabetes medications because of the pain.  (Attach. 1, UHR 377.)

97.  On February 22, 2011, Dr. Pomazal stopped Ramirez's morphine because it was affecting his intestines (it can cause significant constipation) and was not advisable for his condition; continued acetaminophen, 325 mg., three times a day, as needed; and added naproxen, 500 mg., twice a day for pain.  (Attach. 1, UHR 375-379.)  The same day, Ramirez had a blood test which showed very high microalbumin concentrations.  That is an

1    indicator of severe kidney disease in persons with diabetes and
     hypertension, both of which Ramirez had.  Those concentrations
2    can also be elevated by metformin.  (Id. UHR 380.)

3    98.  On March 7, 2011, Dr. Pomazal saw Ramirez because he was
     not taking his insulin.  (Attach. 1, UHR 381-382.)  Ramirez said he
4    was not going to the yard because of pain and wanted gabapentin
     and morphine for the pain.  (Id.)  Dr. Pomazal noted that Ramirez
5    was refusing to take his diabetes medications and had filed two
     inmate appeals in late February 2011 about chronic pain.  (Id.)
6    The next day, Ramirez said he had not yet received the naproxen
     that Dr. Pomazal had ordered.  (Id. at UHR 383.)  Dr. Pomazal
7    ordered that this be checked.  (Id. at UHR 384.)  The order had not
     been sent to the HDSP pharmacy.  (Id. at UHR 379.)  The order
8    was sent to the pharmacy and filled that day.  (Id.)

9    99.  On March 24, 2011, medical staff noted that Ramirez refused
     to come out of his cell in administrative segregation to have his
10   blood glucose checked and to receive insulin and was warned
     about the risks.  (Attach. 1, UHR 385.)  Medical staff noted that it
11   was Ramirez's third straight refusal of care.  (Id.)

12   100.  On March 28, 2011, Nurse Practitioner Burgett saw Ramirez
     at his cell and noted that he refused to come to the clinic for his
13   insulin because he was upset that his morphine had been
     discontinued.  (Attach. 1, UHR 386.)
14
     101.  Dr. Pomazal stopped Ramirez's Lantus on March 29, 2011,
15   because he was refusing to take it, and because his hemoglobin
     A1C's indicated that it was not needed.  Dr. Pomazal continued
16   Ramirez on metformin, 1,000 mg., twice a day, for management of
     Type 2 diabetes.  (Attach. 1, UHR 387.)
17
     102.  On April 5, 2011, Ramirez asked for refills of his
18   medications, including naproxen which were provided.  (Attach. 1,
     UHR 388.)
19
     103.  On April 9, 2011, Ramirez asked to see Dr. Mayes, stating
20   that he did not know why his pain medications had been
     discontinued and asking that they be re-ordered.  (Attach. 1, UHR
21   391.)  "Doctor-shopping" is an indication of drug-seeking
     behavior.
22
     104.  On April 11, 2011, Dr. Pomazal saw Ramirez for a complaint
23   of blurred vision, dizziness, and a medication review.  (Attach. 1,
     UHR 392-393.)  Ramirez reported that he was not using his
24   wheelchair, because he had a walker.  (Id.)  Dr. Pomazal told
     Ramirez that he needed to walk more, exercise, and that another
25   operation for his ventral hernia was not indicated.  (Id.)
     Dr. Pomazal also ordered blood glucose checks twice a week for a
26   month to determine whether the dizziness complaint was due to

low blood glucose.  (Id. at UHR 394.)  Those blood checks showed blood glucose levels that ranged from 75 to 128 mg./dl, which do not show low blood glucose (hypoglycemia), which is below 60 mg./dl.  (Id. at UHR 395.)  A social worker sat in on the appointment to reduce confusion and ensure the patient received consistent information.  (Id. at 393.)  The social worker noted that Ramirez had been told he did not need insulin because his blood sugars were low, but that routine blood glucose checks would be done because of his reports of episodic lightheadedness.  (Id.)  The social worker noted that Ramirez was told that surgery would not be done for his hernia because it was too risky, and that he should abandon use of his wheelchair to maintain his physical health. (Id.)

105.  Physician's Assistant Medina saw Ramirez on April 27, 2011, in the TTA area for a complaint of chest and epigastric pain. (Attach. 1, UHR 398-403.)  Ramirez was given oxygen and a five milligram injection of morphine.  (Id.)  The next day, Ramirez was again seen in the TTA for a complaint of chest and abdominal pain, and again was given a five-milligram injection of morphine. (Id. at 404-405.)

106.  On April 29, 2011, Ramirez again complained of abdominal pain radiating to his chest and nausea.  (Attach. 1, UHR 406-410.) Dr. Hoffman referred him to BLMC for evaluation and treatment. (Id.)  An x-ray of the abdomen showed possible free intra-abdominal air, so a CT was recommended by the radiologist.  (Id. at UHR 411.)  Ramirez was returned to HDSP and was seen again in the TTA on May 4, 2011 for a complaint of abdominal pain. (Id. at UHR 414-417.)  The interpretation of the April 29 x-ray was not done and sent to Dr. Hoffman until later that day.  (Id.)  The report recommended further evaluation with a CT scan.  (Id.) Dr. Hoffman sent Ramirez back to BLMC that day for the CT scan which showed no free air in the abdomen, but did show diverticulosis (pockets in the colon) without diverticulitis (colon infection), a distended gall bladder, multiple renal cysts, and an enlarged prostate gland pressing on the base of the urinary bladder. (Id. at UHR 420-421.)

107.  On May 6, 2011, Ramirez again complained of chest pain from his hernia "pushing upward."  (Attach. 1, UHR 422-425.)  He again asked for pain medications, and was seen by Dr. Hoffman in the TTA.  (Id.)  Ramirez asked for morphine and said he would not take medications for his other medical problems if he did not get the pain medications he wanted.  (Id.)  Dr. Hoffman noted that Ramirez's abdominal pain had resolved and made no changes in his medications.  (Id.)  At that time, Dr. Hoffman only ordered acetaminophen, 325 mg., three times a day as needed for pain.  (Id. UHR 426-428.)

////

108.  On May 9, 2011, Physician's Assistant Medina saw Ramirez in the TTA for a complaint of abdominal pain.  (Attach. 1, UHR 429.)  Ramirez asked for morphine.  (Id.)  Medina referred him to be seen by a doctor.  (Id.)

109.  On May 23 and June 2, 2011, Physician's Assistant Medina renewed doctor's orders for metformin, 1,000 mg., one tablet, twice a day for Ramirez's diabetes and acetaminophen, 325 mg., two tablets, three times a day, for pain.  (Defs.' Ex. A, Swingle Decl., Attach. 1, UHR 431-432.)

110.  On July 1, 2011, Physician's Assistant Miranda saw Ramirez who had been transferred from Facility D to Facility A.  (Attach. 1, UHR 434.)  Ramirez wanted his Comprehensive Accommodation Chrono reviewed and updated.  (Id.)  Miranda told him that toilet grab bars were not medically necessary, but Ramirez claimed that he could not walk more than two steps when he stood up.  (Id.)  Miranda told him he could use a walker in his cell for support, but Ramirez refused the walker, insisted on a cane, and threatened a hunger strike if he did not get the cane.  (Id.)  Miranda told Ramirez that he could not dictate what was medically necessary and issued an updated chrono that provided for barrier free wheelchair access, ground floor/bottom bunk housing, a CPAP mask, toilet seat riser, walker, orthopedic shoes, wheelchair, a mobility and hearing impaired vest, cotton bedding, an extra mattress, an abdominal binder, use of waist chains in the prison, and work restrictions on prolonged standing and sitting.  (Id. at UHR 435-436.)

111.  On July 8, 2011, Physician's Assistant Miranda saw Ramirez for his annual Chronic Care Program visit and update.  (Attach. 1, UHR 437-442.)  Miranda noted that Ramirez was no longer taking insulin or other diabetes treatment, and that his greatest concern was pain associated with his ventral hernia that he claimed had increased in the preceding days.  (Id.)  Ramirez also complained of chronic low back pain and hip pain from the 14 year old pelvic fracture/leg discrepancy.  (Id.)  He said he could not walk because of a "dull" pain that was four on a scale of ten, and that was worse when he sat down for a long time, but was relieved by lying down and resting.  (Id.)  Ramirez said he did not do any exercise, but could perform activities of daily living (ADL's) in his wheelchair.  He had a walker, which he tried to use in the dayroom.  (Id.)  Miranda noted that he was still overweight for his height and urged him to exercise and eat a low-fat diet.  (Id.)  Miranda discussed range-of-motion exercises that Ramirez could do for his chronic low-back and pelvic pain complaint.  (Id.)  Miranda ordered Tylenol # 3, two tablets twice a day, for 10 days, and the return of acetaminophen, 325 mg., three times a day, as needed, for pain for a year.  (Id.)  Miranda deferred a treatment decision on Ramirez's diabetes until after he got the results of a hemoglobin A1C to

assess Ramirez's blood glucose control.  (Id.)  The test was done that day and was 5.5% indicating excellent control, such that insulin and oral medications were not needed.  Ramirez's microalbumin concentrations were again very high.  (Id. at UHR 445.)

112.  On July 12, 2011, Ramirez complained that he had not gotten the Tylenol # 3 yet, and nursing staff contacted the pharmacy. (Attach. 1, UHR 443.)  That was done and the order was to run through July 18, 2011.  (Id. at UHR 448.)

113.  On July 18, 2011, an X-ray of Ramirez's hips, including the pelvis, showed no abnormalities, except for two screws in the left hip.  (Attach. 1, UHR 452.)  An X-ray of the lumbar spine the same day was normal with no significant findings.  (Id. at UHR 453.)  Unlike the earlier X-ray that did not have an optimal view of the disc spaces, this X-ray showed normal heights in the vertebral bodies and normal disc spaces, with good alignment and no compressions or other problems.  (Id.)  The X-ray results did not support Ramirez's complaints of chronic low back and hip pain.

114.  Tests done on August 2, 2011, still showed very high microalbumin concentrations.  (Attach. 1, UHR 454.)

115.  Further urine testing in October 2011 showed no malignant cells and microhematuria (blood in the urine seen only under a microscope).  (Attach. 1, UHR 456-457.)

116.  On October 19, 2011, Ramirez had a renal ultrasound that showed probable cysts in both kidneys, without evidence of hydronephrosis (swelling of the kidney due to urine backup) or evidence of kidney stones.  (Attach. 1, UHR 458.)

117.  In November 2007, Ramirez refused transportation to an appointment with a specialist outside the prison.  (Attach. 1, UHR 459.)

118.  On December 7, 2011, Ramirez's hemoglobin A1C was 5.9%, which still indicated excellent blood glucose control and no need for insulin or oral medications.  (Attach, 1, UHR 460-461.) His  microalbumin concentrations, however, remained high.  (Id.)

119.  On December 29, 2011, Physician's Assistant Miranda completed an updated Comprehensive Accommodation Chrono. (Attach. 1, UHR 460-462.)

120.  On March 1, 2012, Ramirez's hemoglobin A1C was 5.8%, which indicates excellent blood glucose control and no need for insulin or oral medications.  (Attach. 1, UHR 463.)

////

121.  On April 24, 2012, Dr. Mayes issued an updated Comprehensive Accommodation Chrono that included use of a single-tip cane, instead of a walker, and a wheelchair, when needed.  (Defs. Ex. A, Swingle Decl., Attach. 1, UHR 465.)  The following day, Dr. Mayes added Tylenol with codeine, 330 mg-30 mg two tablets, twice a day for 30 days, to the acetaminophen, 325 mg., three times a day, as needed, that Ramirez was already receiving for pain.  (Id. UHR 466-468.)

122.  On May 8, 2012, Dr. Mayes renewed the order for Tylenol # 3 and requested a surgical evaluation for two ventral abdominal hernias.  (Attach. 1, UHR 468.)

123.  On June 7, 2012, Dr. Mayes saw Ramirez.  (Attach. 1, UHR 469-470.)  Dr. Mayes noted that he was awaiting further surgical evaluation for his ventral hernias at the University of California-Davis Medical Center (UCDMC).  (Id.)  Dr. Mayes noted that he had two hernias which were unchanged in size from his previous visit, that his associated pain was controlled with Tylenol # 3, and that he needed a refill of his medications.  (Id.)  Dr. Mayes noted that Ramirez ambulated using a wheelchair because he felt there was a risk his hernias would rupture.  (Id.)  Dr. Mayes re-sent his request for a surgical evaluation and renewed the order for Tylenol # 3.  (Id.)

124.  On June 13, 2012, Ramirez was seen by telemedicine by Dr. Rembetski at Renown Medical Center for surgical evaluation. (Attach. 1, UHR 473-475.)  Ramirez reported occasional pain, that he tried to be active, but that even "wandering around his cell" caused "discomfort."  (Id.)  An examination on telemedicine camera by a nurse showed a large incisional hernia with a diffuse bulge at Ramirez's midline scar.  (Id.)  Dr. Rembetski found that Ramirez seemed to be only modestly inconvenienced by the hernia, that it had been fixed multiple times, and that there was a significant risk of recurrence.  (Id.)  Dr. Rembetski told Ramirez that an abdominal binder to hold the hernia in, and analgesics for pain, would be the appropriate treatment.  (Id.)  Dr. Rembetski's opinion was that this was adequate treatment because his medication controlled pain and his activity was relatively low. (Id.)  Dr. Rembetski noted that if Ramirez developed obstructive symptoms, he would need exploration and repair with mesh, but that there would be a significant chance of recurrence.  (Id.)

125.  On June 20, 2012, Dr. Mayes saw Ramirez for follow-up, noted Dr. Rembetski's finding that surgery was not recommended at that time, and recommended that Ramirez should be managed with an abdominal binder and analgesics.  (Attach. 1, UHR 476-479.)  Dr. Mayes ordered an extra-large abdominal binder and continuation of Tylenol # 3.  (Id.)

////

126.  Ramirez is currently managed for diabetes on weight loss and diet alone, and without insulin or oral diabetes medications. (Attach. 1, UHR 481.)

127.  I understand that Ramirez claims that he did not receive physical therapy.  No doctor ordered physical therapy for him or referred him to a physical therapist, although several recommended that he try to get out of his wheelchair and exercise more.  Given Ramirez's ventral hernia and ongoing insistence that he could not walk without pain, that he did not exercise, and that even sitting for long periods and walking around his cell caused him discomfort, it is not reasonable to believe that he would have participated in a physical therapy program or derived any benefit from one.

128.  In my opinion, Ramirez has received appropriate medical care for diabetes and his ventral hernia that was within the community standard of care for those conditions.

(Dkt. No. 53-3 at 3-32.)

F.  Insulin Dose

*Defendants' Motion*

As set forth above, plaintiff alleges that prior to October 2009, defendant Medina mismanaged his insulin dose.  Plaintiff alleges that in November 2009, defendant Swingle ratified this management by denying plaintiff's grievance regarding this matter.  Plaintiff alleges that defendant Medina made unnecessary changes to his insulin dose in December 2009 in retaliation for plaintiff's grievance.

Defendants move for summary judgment on grounds that defendant Medina did not change plaintiff's insulin dose.  Defendants cite defendant Swingle's declaration describing plaintiff's treatment for diabetes during the relevant time period.  Because defendant Swingle's declaration addresses a variety of medical problems suffered by plaintiff, the undersigned herein summarizes the portion of defendant's  declaration addressing plaintiff's diabetes, adding additional information from the medical records submitted where appropriate.

When plaintiff arrived at HDSP in March 2009, Dr. Lankford wrote an order for continuing plaintiff's diabetes regimen without changes. (Dkt. No. 53-3 at ¶ 19.)  At that time,

plaintiff received blood glucose checks three times a day; Lantus insulin, 26 units every evening; sliding-scale regular insulin in varying amounts depending how much plaintiff's finger-stick blood glucose was above 200 mg/dL; and glipizide, five mg., one-half tablet, twice a day.  (Dkt. No. 53-4 at 66.)

On March 18, 2009, Nurse Wrigley ordered metformin, 1,000 mg., twice a day for diabetes.  (Dkt. No. 53-3 at ¶ 24; Dkt. No. 53-4 at 73.)  On April 2, 2009, Nurse Wrigley changed plaintiff's blood glucose checks to twice a day, rather than three times a day.  (Dkt. No. 53-3 at ¶ 27; Dkt. No. 53-4 at 80.)  On June 1, 2009, Physician's Assistant Miranda found that plaintiff's diabetes was well-controlled.  (Dkt. No. 53-3 at ¶ 31; Dkt. No. 53-5 at 8.)

On September 8, 2009, defendant Medina interviewed plaintiff regarding an administrative appeal claiming, in part, that Nurse Practitioner Burgett had discontinued his prescription for glipizide and metformin.  (Dkt. No. 53-3 at ¶ 41; Dkt. No. 53-12 at 19-20.)  The response to this appeal states that defendant Medina told plaintiff that he was receiving his diabetic medications.  (Dkt. 53-12 at 19.)  Defendant Medina's September 21, 2009 report from his chronic care evaluation of plaintiff lists glipizide, metformin and lantus at the same doses previously prescribed.  (Dkt. No. 53-5 at 30.)  The record contains no evidence that plaintiff's glipizide and metformin had been discontinued by defendant Medina or anyone else and plaintiff has presented no evidence to support such a claim.

On October 29, 2009, plaintiff told a nurse that he was not going to play defendant Swingle's games and returned the glipizide and metformin that he kept on his person.  (Dkt. No. 53-3 at ¶ 46; Dkt. No. 53-5 at 35.)  Two days later, the medication was returned when plaintiff reported that he was not feeling well.  (Dkt. No. 53-3 at ¶ 46; Dkt. No. 53-5 at 36.)

On November 2, 2009, defendant Swingle saw plaintiff, who had been referred to the  High Risk Clinic by defendant Medina based on his failure to respond to his diabetic care regimen.   (Dkt. No. 53-3 at ¶ 58; Dkt. No. 53-5 at 39-41.)  Plaintiff claimed that he did not go to the pill line for his diabetic medication or to the clinic for evaluation because he had pain when

1    walking.  (Id.)  Plaintiff asked for a wheelchair.  (Id.)  Defendant Swingle agreed to provide

2    plaintiff with a wheelchair as long as he agreed to completely comply with his diabetic

3    management, and plaintiff agreed.  (Id.)

4              On December 12, 2009, plaintiff refused his insulin and all diabetic care in protest

5    of the reduction of his gabepentin and tramadol by defendant Medina on December 9, 2009.

6    (Dkt. 53-3 at ¶ 59; Dkt. No. 53-6 at 30-38.)  Over the next week, plaintiff said he would be on a

7    hunger strike and not take his insulin or diabetic medications unless he got the pain medication

8    doses he wanted.  (Dkt. No. 53-3 at ¶ 60; Dkt. No. 53-6 at 50-54.)

9              On December 21, 2009, defendant Medina saw plaintiff because he was not

10   following his diabetic regime.  (Dkt. No. 53-3 at ¶ 61; Dkt. No. 53-6 at 56.)  At that time,

11   plaintiff was still prescribed lantus insulin, glipizide and metformin at the doses previously

12   prescribed.  (Dkt. No. 53-7 at 2.)  Defendant Medina advised plaintiff that he could suffer

13   harmful affects if he did not adhere to his diabetic regime.  (Id.)

14             Plaintiff's medical records from  December 22, 2009, December 24, 2009 and

15   December 26, 2009,  indicate that plaintiff was still on the hunger strike and refusing his diabetic

16   medication.  (Id. at 4-6.)   It is unclear when plaintiff ended the hunger strike and resumed his

17   diabetic medication.  However, on February 4, 2010, defendant Medina increased plaintiff's

18   gabapentin and tramadol to the doses that had been prescribed prior to December 9, 2009.  (Dkt.

19   No. 53-3 at ¶  64; Dkt. No. 53-7 at 10.)  The report from the February 4, 2010 examination

20   indicates that the doses of plaintiff's diabetic medications were unchanged.  (Dkt. No. 53-7 at

21   10.)

22             Forms listing plaintiff's medications as of March 25, 2010, June 24, 2010, and

23   July 29, 2010, all containing defendant Medina's stamped name, reflect plaintiff's diabetes

24   medication doses as unchanged.  (Dkt. No. 53-7 at 17-28; Dkt. No. 53-8 at 25-26; Dkt. No. 53-8

25   at 32-33.)

26   ////

Defendants' records following July 2010 show no evidence that either defendant mismanaged plaintiff's diabetes medication.  In September 2010, plaintiff refused his diabetic medication unless he got a new wheelchair, a grab bar in his cell and an anti-skid surface in front of his shower.  (Dkt. No. 53-3 at ¶ 77.)  Plaintiff's hemoglobin A1C test result from October 26, 201 was 5.3%, which showed excellent diabetes control.  (Id. at ¶ 81.)  On November 17, 2010, Dr. Hoffman saw plaintiff because of plaintiff's refusal to take insulin.  (Id. at ¶ 83.)  On November 30, 2010, Dr. Hoffman saw plaintiff for follow-up and noted that plaintiff's blood sugars were in extremely good control.  (Id. at ¶ 86.)  Dr. Hoffman agreed to stop plaintiff's morning blood glucose checks because plaintiff claimed it was too painful to get out of bed.  (Id.)

On December 3, 2010, Dr. Hoffman stopped morning sliding-scale regular insulin because plaintiff's morning blood glucose checks had been stopped, the sliding scale insulin was only given based on blood glucose checks that were above certain levels, and plaintiff's hemoglobic A1C's showed that his diabetes was under excellent control.  (Id. at ¶ 87.)

On March 7, 2011, Dr. Pomazal saw plaintiff because plaintiff was not taking his insulin, apparently to protest inadequate pain medication.  (Id. at 98.)  On March 24, 2011, medical staff noted that plaintiff refused to come out of his cell to have his blood glucose checked and to receive insulin.  (Id. at 99.)  On March 29, 2011, Dr. Pomazal stopped plaintiff's Lantus because plaintiff was refusing to take it and his hemoglobin A1C's indicated that he did not need it.  (Id. at ¶ 101.)  At that time, plaintiff was still taking meformin at the same dose as previously ordered.  (Dkt. No. 53-10 at 28.)  It appears that the glipizide was discontinued at an earlier time, although defendants do not address this fact.  Attached to plaintiff's opposition is a form indicating that on September 28, 2010, Dr. Hoffman changed plaintiff's dose of lantus insulin and stopped his glipizide prescription.  (Dkt. No. 64 at 16.)

On May 23, 2011, and June 23, 2011, defendant Medina renewed plaintiff's prescription for metformin at the same dose previously prescribed.  (Dkt. No. 53-3 at ¶ 109.)

1    On July 8, 2011, Physician's Assistant Miranda saw plaintiff for plaintiff's annual

2 Chronic Care Program visit.  (Id. at ¶ 111.)  Miranda noted that plaintiff was no longer taking

3 insulin or other diabetes treatment.  (Id.)  Miranda deferred treatment regarding plaintiff's

4 diabetes until he got the results of a hemoglobin A1C test to assess plaintiff's blood glucose

5 control.  (Id.)  The test, done that day, was 5.5%, indicating excellent control such that insulin

6 and oral medications were not needed.  (Id.)

7    Blood tests on December 7, 2011, showed plaintiff's hemoglobic A1C at 5.9%,

8 which still indicated excellent blood glucose control and no need for insulin or oral medications.

9 (Id. at ¶ 118.)  On March 1, 2012, plaintiff's hemoglobic A1C was at 5.8%, which indicated

10 excellent blood glucose control and no need for insulin or oral medications.  (Id. at 120.)

11    *Plaintiff's Opposition*

12    In his opposition, plaintiff's arguments focus mainly on the alleged denial of

13 adequate pain medication.  However, attached to the opposition as exhibits are several

14 documents addressing the issue of diabetes medication.  Included is a form that appears to be

15 dated February 2, 2010, stating that plaintiff's glipizide was discontinued.  (Dkt. No. 64 at 9.)

16 This form also states that plaintiff's metformin was discontinued as well.  (Id.)  This form

17 indicates that the prescriptions for both of these medications, prescribed by defendant Medina,

18 expired on January 7, 2010.  (Id.)  These forms appear to reflect the discontinuation of these

19 medications based on plaintiff's refusal to take these drugs during that time.

20    Plaintiff also presented a form reflecting the discontinuation of his morning

21 sliding scale insulin on December 3, 2010, as ordered by Dr. Hoffman.  (Id. at 13.)

22    Plaintiff also presented a form dated April 1, 2010, indicating the discontinuation

23 or expiration of a prescription for what appears to be the lantus insulin.  (Id. at 15.)  Defendants'

24 evidence demonstrates that Dr. Pomazal discontinued plaintiff's lantus prescription in March

25 2011.  Plaintiff's record stating that the lantus was "discontinued" on April 1, 2010, appears to

26 reflect the expiration of a prescription.

1       *Analysis*

2           The undersigned can find no evidence demonstrating that defendant Medina

3   mismanaged plaintiff's insulin or other diabetes medications either prior to October 2009 or

4   after.  Defendants' evidence demonstrates that plaintiff received the same dose of lantus,

5   glipizide and metformin at least through July 2010.  Plaintiff also continued receiving sliding

6   scale doses of insulin based on the results of his finger stick glucose tests.  There is no evidence

7   that defendant Medina administered these tests or otherwise interfered with plaintiff's receipt of

8   his sliding scale doses of insulin.

9           Changes made to plaintiff's diabetes medication after July 2010 were made by

10  Dr. Hoffman and Dr. Pomazal.  In fact, plaintiff's diabetes became so well managed that he no

11  longer required diabetes medication.  The evidence presented in plaintiff's opposition does not

12  refute these findings.  For these reasons, the undersigned cannot find that either defendant

13  Medina or Swingle mismanaged plaintiff's diabetes medication in violation of plaintiff's Eighth

14  Amendment right to adequate medical care.

15          Plaintiff alleges that defendant Medina made unnecessary changes to his insulin

16  after December 2009 in retaliation for plaintiff's administrative grievances.  A retaliation claim

17  contains five basic elements:  (1) an assertion that a state actor took some adverse action against

18  an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled

19  the inmate's exercise of his First Amendment rights (or that the inmate suffered more than

20  minimal harm) and (5) did not reasonably advance a legitimate correctional goal.  Rhodes v.

21  Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

22          As discussed above, there is no evidence that defendant Medina made any

23  changes to any of plaintiff's diabetic medications after December 2009.  For that reason,

24  plaintiff's retaliation claim fails.

25  ////

26  ////

1    For these reasons, defendants' should be granted summary judgment as to these

2    claims.  Because defendants are entitled to summary judgment on the merits of these claims,

3    there is no need to address the issue of qualified immunity.

4        G.  Physical Therapy

5        Defendants move for summary judgment as to plaintiff's claim that he was

6    improperly denied physical therapy on the grounds that there is no evidence that physical therapy

7    was indicated.  Defendants have demonstrated that there is no evidence in plaintiff's medical

8    records of any health care provider ordering physical therapy for plaintiff.  (Dkt. No. 53-3 at

9    ¶ 90.)  While Dr. Hoffman noted that plaintiff might benefit from physical therapy for his

10   difficulty balancing and walking, she did not later order physical therapy.  (Id.)  In her

11   declaration, defendant Swingle stated that plaintiff's difficulty and walking were associated with

12   his insistence on using a wheelchair, rather than exercising his leg muscles by walking.  (Dkt.

13   No. 53-3 at ¶ 90.)

14       The undersigned has reviewed plaintiff's opposition and finds no evidence

15   supporting his claim that defendants improperly denied him physical therapy.  Plaintiff has

16   presented no evidence demonstrating that physical therapy was ordered by a physician or

17   otherwise medically warranted.

18       Defendants' unopposed evidence demonstrates that plaintiff did not require

19   physical therapy.  Accordingly, defendants should be granted summary judgment as to this

20   claim.  Because defendants are entitled to summary judgment on the merits of this claim, there is

21   no need to address the issue of qualified immunity.

22       H.  Pain Medication/Retaliation

23       Defendants move for summary judgment on the grounds that there is no evidence

24   that defendants mismanaged plaintiff's pain medication prior to December 2009, or that

25   defendant Medina acted with deliberate indifference or was motivated to retaliate against

26   plaintiff when he lowered plaintiff's doses of pain medication in December 2009.

1    Defendant Swingle's declaration demonstrates that neither defendant mismanaged

2  plaintiff's pain medication prior to December 2009.  While plaintiff requested additional pain

3  medication during the fall of 2009, he was seen engaging in behavior suggesting that he was

4  sharing his pain medicine with his cellmate.  Plaintiff was also seen engaging in physical activity

5  inconsistent with his claims of physical pain.  Based on these circumstances, defendants' refusal

6  to increase plaintiff's pain medication during this time did not constitute deliberate indifference

7  to his serious medical needs.  There is no evidence in the record demonstrating that either

8  defendant otherwise mismanaged plaintiff's pain medication prior to December 2009.  For these

9  reasons, defendants should be granted summary judgment as to this claim.

10    It is undisputed that on December 9, 2009, defendant Medina reduced plaintiff's

11  gabapentin from 1800 mg. twice a day to 1200 mg. twice a day, and plaintiff's tramadol from

12  150 mg. twice a day to 100 mg. twice a day.  Gabapentin 1800 mg. twice a day is the maximum

13  dose allowed of that drug.  (Dkt. No. 53-3 at ¶ 24.)

14    In his declaration submitted in support of the summary judgment motion,

15  defendant Medina states that he lowered plaintiff's gabapentin and tramadol on December 9,

16  2009, because the higher doses of these drugs did not appear to be effective in relieving

17  plaintiff's pain symptoms.  (Dkt. No. 53-14 at ¶ 29.)  Defendant Medina states that in pain

18  management, the rule is to use the lowest dose that is effective in treating a patient's pain.  (Id.)

19  Sometimes a pain medication "holiday" is effective in producing a response.  (Id.)  On

20  February 4, 2010, defendant Medina increased plaintiff's doses of gabapentin and tramadol to

21  what they had been before December 9, 2009, because plaintiff reported increased pain.  (Id. at

22  34.)

23    The evidence indicates that defendant Medina was not involved in any decisions

24  after February 4, 2010, involving the reduction of plaintiff's pain medication.  On November 30,

25  2010, defendant Swingle did not approve Dr. Hoffman's request for plaintiff's continued use of

26  non-formulary tramadol because plaintiff had been receiving it, as well as acetaminophen,

1   morphine and gabapentin, without apparent mitigation of pain.  On January 11, 2011,

2   Dr. Hoffman began tapering off plaintiff's gabapentin because it was not approved to treat

3   plaintiff's medical problems.  In addition, gabapentin had not proved to be effective in treating

4   his pain.  On February 22, 2011, Dr. Pomazal discontinued plaintiff's morphine because it was

5   affecting his intestines and was not advisable for his condition.  On April 24, 2012, Dr. Mayes

6   added Tylenol with codeine to the acetaminophen that plaintiff was already taking.

7           In his opposition, plaintiff offers no expert evidence that a pain medication

8   "holiday" was not a proper course of treatment.

9           Considering that plaintiff had been taking the highest dose of gabapentin allowed,

10  and a high dose of tramadol, and still complained of pain, the undersigned does not find that

11  defendant Medina acted with deliberate indifference in reducing plaintiff's dose of these drugs in

12  order to determine whether a pain medication "holiday" might increase their effectiveness.

13  Defendant Medina did not completely discontinue plaintiff's pain medication, but temporarily

14  reduced plaintiff's dose in an attempt to increase the effectiveness.  Once sufficient time had

15  passed for defendant Medina to make a determination that the pain medication "holiday" had not

16  worked, defendant Medina reinstated plaintiff's previous dose of gabapentin and tramadol.

17  Because defendant Medina did not act with deliberate indifference to plaintiff's serious medical

18  needs when he temporarily decreased plaintiff's dose of gabapentin and tramadol, defendant

19  Medina should be granted summary judgment as to plaintiff's Eighth Amendment claim.

20          Plaintiff also argues that defendant Medina reduced his pain medication in

21  retaliation for an administrative grievance plaintiff filed complaining about defendant Medina.

22          As discussed above, defendant Medina reduced the dose of plaintiff's pain

23  medication because plaintiff had been on a high dose of pain medication that was not effective in

24  treating his pain.  Defendant Medina's temporary reduction of plaintiff's dose of pain medication

25  reasonably advanced a legitimate correctional goal, i.e., an attempt to increase the effectiveness

26  of the pain medication.  <u>Rhodes</u>, 408 F.3d at 547-68.  In fact, plaintiff signed a pain medication

1   management and controlled substance treatment agreement containing the new dosage of

2   medication.  (Dkt. No. 53-6 at 21.)

3         Because defendant Medina's decision to reduce plaintiff's dose of pain

4   medication reasonably advanced a legitimate correctional goal, defendant Medina should be

5   granted summary judgment as to plaintiff's retaliation claim.

6         Because defendants are entitled to summary judgment on the merits of these

7   claims, there is no need to address the issue of qualified immunity.

8   III.  Motions for Injunctive Relief

9         In the pending motions for injunctive relief, plaintiff requests that defendants be

10  ordered to provide him with adequate pain medication, adequate dosages of insulin, breathing

11  treatments and a walker.  Regarding pain medication, plaintiff requests that he be provided with

12  morphine or tramadol and gabapentin.

13        On February 24, 2012, defendants filed an opposition to plaintiff's motions for

14  injunctive relief.  On June 22, 2012, the undersigned ordered defendants to file further briefing in

15  support of their opposition.  Defendants' summary judgment motion contains this further

16  briefing.

17     A.  Legal Standard

18        "The proper legal standard for preliminary injunctive relief requires a party to

19  demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

20  in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

21  injunction is in the public interest.'"  Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir.

22  2009), quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

23        A Ninth Circuit panel has found that post-Winter, this circuit's sliding scale

24  approach  or "serious questions" test survives "when applied as part of the four-element Winter

25  test."  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  "In other

26  words, 'serious questions going to the merits,' and a hardship balance that tips sharply toward

1   the plaintiff can support issuance of an injunction, assuming the other two elements of the

2   Winter test are also met." Id. at 1132.

3          In cases brought by prisoners involving conditions of confinement, any

4   preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the

5   harm the court finds requires preliminary relief, and be the least intrusive means necessary to

6   correct the harm." 18 U.S.C. § 3626(a)(2).

7          *Analysis*

8          The Supreme Court has held that a preliminary injunction is appropriate to grant

9   relief of the "same character as that which may be granted finally." De Beers Consol. Mines v.

10   U.S., 325 U.S. 212, 220 (1945). A court may not issue an injunction in "a matter lying wholly

11   outside the issues in the suit." Id. A court need not consider claims that were not raised in the

12   complaint. McMichael v. Napa County, 709 F.2d 1268, 1273 n.4 (9th Cir. 1983). Additionally,

13   "a party moving for a preliminary injunction must necessarily establish a relationship between

14   the injury claimed in the party's motion and the conduct asserted in the complaint." Devose v.

15   Herrington, 42 F.3d 470, 471 (8th Cir. 1994).

16          This action is not proceeding on claims regarding breathing treatments or denial

17   of access to a walker. Accordingly, plaintiff's motions for injunctive relief regarding breathing

18   treatments and denial of access to a walker should be denied because they are unrelated to the

19   claims on which this action is proceeding.

20          Defendants argue that plaintiff's motions for injunctive relief should be denied

21   because plaintiff has not shown a likelihood of success on the merits necessary for injunctive

22   relief. Because the undersigned finds that defendants are entitled to summary judgment as to the

23   merits of plaintiff's claims, plaintiff's motions for injunctive relief should be denied on this

24   ground.

25          The undersigned also finds that plaintiff has not demonstrated that he is likely to

26   suffer irreparable harm in the absence of preliminary relief. Regarding his request to be

provided with adequate insulin, the record demonstrates that plaintiff no longer requires insulin

or other medications to treat his diabetes.  Plaintiff has provided no evidence demonstrating that

his need for insulin or other medications to treat his diabetes has changed.  The record also

indicates that plaintiff's hemoglobic A1C is regularly checked in order to monitor plaintiff's

need for medication.  For these reasons, the undersigned finds that plaintiff will not suffer

irreparable harm if the court does not order that he receive adequate doses of insulin.

Plaintiff has not demonstrated that he will suffer irreparable harm if morphine or

tramadol and gabepentin are not reinstated.

Regarding morphine, defendants have presented evidence that on February 22,

2011, Dr. Pomazal stopped plaintiff's morphine because it was affecting his intestines.  (Dkt.

No. 53-10 at 17-18.)  In addition, morphine was not advisable for long-term use for someone

with obstructive sleep apnea, such as plaintiff.  (Dkt. No. 53-3 at ¶ 97).[2]

Tramadol, a non-formulary drug, was discontinued because it did not appear to

help plaintiff's pain.  Gabapentin was discontinued after it was determined that it was not

---

[2]  The undersigned observes that attached to plaintiff's January 20, 2012 motion for injunctive relief are exhibits suggesting that plaintiff received morphine after February 22, 2011. For example, a second administrative appeal, appeal no. 11-61, signed by defendant Swingle on February 24, 2011, stated that plaintiff was receiving 30 mg. morphine tablets in the a.m. and 15 mg. morphine tablets in the p.m. "which Dr. Hoffman found to be medically indicated." (Dkt. No. 35 at 36.)  Also attached is a memorandum to plaintiff from the California Prison Health Care Services, Offices of Third Level Appeals, dated June 3, 2011. (Id. at 39.)  This document stated, "It has been verified by the HDSP Medical Department that you are currently prescribed Morphine and Tylenol for your pain issues." (Id. at 40.)

The undersigned has reviewed plaintiff's medical records submitted by defendants for dates following February 24, 2011, and can find no indication that plaintiff continued to be prescribed morphine after that date.  The undersigned lists some of these records herein:  Dkt. No. 53-10 at 28 (records from March 29, 2011); Dkt. No. 53-11 at 4 (May 6, 2011 entry stating, "Has taken morphine in the past..."); Dkt. No. 53-11 at 5-7 (list of plaintiff's medications as of May 6, 2011, with no listing for morphine); Dkt. No. 53-11 at 19-21 (lists of plaintiff's medications as of July 8, 2011, with no listing for morphine).  As noted in defendant Swingle's declaration, plaintiff does not take morphine at the present time.

It appears that the statements in February 24, 2011 grievance and June 3, 2011 memorandum that plaintiff still continued to take morphine were based on outdated information, because plaintiff's medical records clearly indicate that Dr. Pomazal discontinued plaintiff's morphine prescription on February 22, 2011.

1  approved by the FDA or CDCR to treat any medical problem suffered by plaintiff.  In addition, it

2  was also determined that gabapentin had not been effective in treating plaintiff's pain.

3          As of June 2012, plaintiff was taking Tylenol with codeine for pain.  (Dkt.

4  No. 53-11 at 53.)  According to Dr. Rembetski's June 13, 2012 report, this amount of pain

5  medication seems to keep plaintiff's pain under control.  (Id. at 54.)

6          Based on the medical records described above, the undersigned does not find that

7  plaintiff will suffer irreparable harm if morphine or gabapentin and tramadol are not reinstated to

8  treat his pain.  Gabpentin and tramadol did not effectively treat plaintiff's pain the past.

9  Morphine was not medically advisable for long term use by plaintiff.  The record indicates that

10  plaintiff is receiving Tylenol with codeine which keeps plaintiff's pain under control.

11          For the reasons discussed above, plaintiff's motions for injunctive relief should be

12  denied.

13          Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for an extension

14  of time (Dkt. No. 62) is denied as unnecessary;

15          IT IS HEREBY RECOMMENDED that:

16          1.  Plaintiff's motions for injunctive relief (Dkt. Nos. 28 and 35) be denied;

17          2.  Defendants' motion for summary judgment (Dkt. No. 53) be granted.

18          These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

20  one days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

23  objections shall be filed and served within fourteen days after service of the objections.  The

24  ////

25  ////

26  ////

1    parties are advised that failure to file objections within the specified time may waive the right to

2    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3    DATED:  November 14, 2012

4

5

6                                              KENDALL J. NEWMAN
                                               UNITED STATES MAGISTRATE JUDGE
7

8
     ram45.sj
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26